UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**MARGARET ZAVALIDROGA AND TOMAS ZAVALIDROGA,**

                              **Plaintiffs,**

          **-v-**                                 **6:11-CV-277 (NAM/DEP)**

**ONEIDA COUNTY SHERIF'S DEPARTMENT; LEE BRONISZEWSKI, an Oneida County Sheriff's Deputy; ONEIDA COUNTY DEPARTMENT OF SOCIAL SERVICES; RICHARD FERRUCCI, An Oneida County Investigator; NORMAN X., An Oneida County Investigator; THE COUNTY OF ONEIDA; JEFFERY KELLEY, individually; ANDREW CLARK, individually; VILLAGE OF CAMDEN; CHARLES GABRIEL, a Village of Camden police officer; FAXTON-ST. LUKES HOSPITAL; DR. KEVIN CATNEY; NEW YORK MUNICIPAL INSURANCE RECIPROCAL; TOWN OF KIRKLAND, GENE C. SINARDO, a Town of Kirkland police officer, JOHN DOE, a fictitious name Intended to represent an unknown resident of the Town of Kirkland,**

                              **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Margaret Zavalidroga, *pro se*
Tomas Zavalidroga, *pro se*
Plaintiffs

Gorman, Waszkiewicz, Gorman and Schmitt
Bartle J. Gorman, Esq., of counsel
1508 Genesee Street
Utica, New York  13502-4178
Attorney for Oneida County Sheriff's Department, Lee Broniszewski,
Oneida County Department of Social Services, Richard Ferucci,
Oneida County of Oneida, and Norman X

A. Sheldon Gould, Esq.
P.O. Box 11169
Syracuse, New York 13218
Attorney for Defendant Jeffrey Kelley

Getnick Livingston Atkinson & Priore, LLP
Patrick G. Radel, Esq., of counsel
258 Genesee Street, Suite 401
Utica, New York 13502
Attorney for Defendant Andrew Clark

Mackenzie, Hughes LLP
Jeffrey D. Brown, Esq., of counsel
101 South Salina Street, PO Box 4967
Syracuse, New York 13221
Attorney for Defendants Village of Camden, Charles Gabriel,
Town of Kirkland, and Gene C. Sinardo

Napierski, VanDenburgh & Napierski, LLP
Shawn F. Brousseau, Esq., of counsel
296 Washington Avenue Extension
Albany, New York 12203
Attorney for Faxton-St.Lukes Hospital and Dr. Kevin Catney

Congdon, Flaherty, O'Callaghan, Reid, Donlon, Travis & Fishlinger
Avis S. Decaire, Esq., of counsel
12 Metro Park Road, Suite 207
Colonie, New York 12205
Attorney for Defendant New York Mutual Insurance Reciprocal

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## INTRODUCTION

In this civil rights action pursuant to 42 U.S.C. § 1981, 1983, and 1985, there are currently

five pending dismissal motions.  The first is filed by Oneida County Sheriff's Department, Lee

Broniszewski, Oneida County Department of Social Services, Richard Ferucci, County of Oneida,

and Norman X. (Dkt. No. 18); the second by Andrew Clark (Dkt. No. 24); the third by the Town

of Kirkland and Gene C. Sinardo (Dkt. No. 57); the fourth by New York Municipal Insurance

Reciprocal ("NYMIR") (Dkt. No. 76); and the fifth by the Village of Camden and Charles

-2-

Gabriel (Dkt. No. 78).  The Court grants the sixth motion (Dkt. No. 62), a request by Norman

Peep that all  references to Norman X in the motion papers be deemed to refer to Norman Peep.

### AMENDED COMPLAINT

The amended complaint (Dkt. No. 8) alleges that Lee Broniszewski is an Oneida County

Sheriff's Deputy; Richard Ferucci is an investigator with the Oneida County District Attorney's

Office and assists the Oneida County Department of Social Services with investigations; Norman

Peep is an investigator employed by Oneida County; Charles Gabriel is a police officer employed

by the Village of Camden; and Gene C. Sinardo is a police officer employed by the Town of

Kirkland.  Jeffrey Kelley and Andrew Clark reside in Camden, New York and are sued in their

individual capacities only.  Dr. Kevin Catney is a physician employed by Faxton-St. Lukes

Hospital.  The amended complaint relates the following events (Dkt. No. 8, pp. 3-10):[1]

> On March 12, 2008 at about 5:30 p.m., Plaintiff, Tomas Zavalidroga was in
> the Village of Camden distributing flyers relating to a Village election which
> was to take place March 18th, 2008. Zavalidroga, who was on a bicycle,
> noticed that a burgundy colored pick up truck had pulled up along side him.
> Zavalidroga recognized the truck's driver as Jeffery Kelley, one of the
> candidates in the March 18th Camden Village Trustee election which was the
> subject of Zavalidroga's flyers.
>
> Kelley yelled out of his window, "hey, buddy".  Alarmed by Kelley's behavior
> due to prior harassment by Kelley, Zavalidroga quickly flipped around his
> bicycle and started in the opposite direction. Kelley then made a U-turn in the
> middle of the street and began pursuing Zavalidroga at a high rate of speed.
>
> Zavalidroga had gotten about 100 feet when a second red colored pick-up had
> raced up from a side street blocking Zavalidroga in the middle of the
> intersection. The individual in the red colored pickup, later identified as
> Andrew Clark, was then heard yelling out his window, "go on, get him".
> Kelley by then had raced up, blocking Zavalidroga from the rear.

---

[1] The Court quotes the amended complaint directly without noting or correcting errors.

Perceiving the situation as a gang assault in progress, Zavalidroga flipped his bicycle around again and raced down the Village of Camden's main street towards the downtown commercial district. Zavalidroga noticed Kelley pursuing him on the opposite side of the street.

Upon reaching the business district, Zavalidroga switched direction again in an attempt to evade Kelley. While Zavalidroga was passing Kelley's open window, Kelley had yelled out, "Hey Buddy, you're dead.". Kelley then made a U-turn in the middle of the busy throughfare and again pursued Zavalidroga through the business district at a high rate of speed.

Zavalidroga eventually ditched his bicycle and took cover inside a dollar store on Camden's main street. Kelley quickly raced up in pursuit and parked in front of the Dollar Store. Almost simultaneously, Andrew Clark had also pulled up in his truck alongside Kelley in front of the Dollar Store.

Inside the store, a number patrons had gathered near the front window of the store. Zavalidroga asked those present to call 911 dispatch. Several of the patrons did this and the Zavalidroga himself was handed a phone and told the police dispatcher that Kelley and Clark had been pursiuing him with their trucks. One of the patrons described Clark as a local commissner of Police.

About ten minutes after Zavalidroga call to 911, a number of police agentcies, local, county, and state, arrived in unison outside the store. A Sheriffs deputy, later identified as Lee Broniszewski, was the first to enter the store.

Broniszewski immediately compelled Zavalidroga to drop the telephone he was speaking on and forced Zavalidroga back to a remote corner of the store. Broniszewski, without permission, began to reach into Zavalidroga's pockets and remove items, thereby violating Zavalidroga's Fourth Amendment rights.

A short time later Broniszewski was joined by several other police officers from various agencies. One of these officers, Village of Camden patrolman, Charles Gabriel, quickly took the lead. Zavalidroga asked Gabriel to remove Kelley and Clark from the front of the store so he could safely exit.  Gabriel refused to do this stating that, "They have a right to be there".  Instead of entertaining arrests of Kelley and Clark, Gabriel began to accost Zavalidroga. Gabriel demanded to know why Zavalidroga had been distributing the leaflets throughout the Village. Gabriel also stated that the content of the leaflets looked like slander of the Kelley family to him. It was clear to Zavalidroga that Gabriel and the other police officers present were during all they could to suppress Zavalidroga's First and Fourteenth Amendment rights and insulate Kelley and Clark from criminal prosecution.

-4-

The next day, at about 10:am in the morning, Plaintiff Margaret Zavalidroga was in front of her house, which is about six miles from the Village of Camden, when Jeffery Kelley had come down the road and pulled up in front of Zavalidroga. Zavalidroga observed Kelley taking several pictures of her with his camera. Kelley also was observed taking out a note pad and writing down the license plate number of Zavalidroga's car. Kelley then departed down the road.

This incident, in connection with Kelley's murderous threat towards Tomas Zavalidroga the previous day, prompted the Zavalidrogas to seek a Criminal Complaints at a local FBI office and State Police Barracks later that day. Neither of these police agencies were willing to entertain any meaningful action against Kelley or Clark. In an obvious effort to further insulate Kelley and Clark from due prosecution, the State Trooper(Gallager) who had taken Tomas Zavalidroga's deposition stated that in his opinion, Kelley and Clark could be charged with no more than a simple violation.

Realizing that the police were violating their Fourteenth Amendment rights of due process and equal protections, the Zavalidrogas filed their own criminal Complaints directly with the Oneida County District Attorney, who refused to act on said Complaints.

A short time after having filed their criminal Complaints against Kelley and Clark with Oneida County District Attorney McNamara, Maragret Zavalidroga received a "courtesy call" from an investigator with the District Attorney's office, Richard Ferucci, who claimed to be calling on behalf of Oneida County Adult Protective Services. Ferucci stated that he had received an anonymous call from a member of the public who was concerned for Margaret Zavalidroga's welfare. Zavalidroga told Ferucci about the threatening conduct of Kelley. At one point in the telephone conversation, Ferucci stated that he was concerned that someone like Margaret Zavalidroga might, "end up dead the next week." Neither Ferucci nor anyone else with the District Attorney's office did anything about Kelley. It was obvious to the Zavalidrogas that Ferucci's contrived "courtesy call" of concern was little more than a veiled threat which further chilled the Zavalidroga's civil rights.

Beginning in late 2009, Margaret Zavalidroga began receiving the first of a series of death threats left on her home telephone answering system.

On September 11, 2010 at about 8:30 p.m., a truck matching one owned by Andrew Clark, pulled up in front of Margaret Zavalidroga's property, and the individual driving lowered the window and fired a handgun out the window, then spinning his wheels in a hasty departure. Margaret Zavalidroga called regional 911 at 8:50 p.m. to report the incident and have a patrol car come to

investigate. None was ever dispatched, and the incident was never investigated.

On October 30th, 2010, Margaret Zavalidroga and Tomas Zavalidroga were in the Village of Clinton, Town of Kirkland, so that Margaret Zavalidroga could attend church services at Clinton's St. Mary's Church on Marvin St. in the village. While Tomas Zavalidroga waited in Margaret Zavalidroga's car nearby, he was harassed by a local resident who disliked having Margaret Zavalidroga's legally parked car in front of his house. The individual at one point asked Tomas Zavalidroga to identify himself and then, in a threatening manner, began following Zavalidroga along Marvin St. for some distance as Zavalidroga walked toward the church. Zavalidroga last saw the man speaking on a cell phone and then later looking into the windows of Margaret Zavalidroga's car. This individual, whose name is currently unknown, is represented as John Doe in this Complaint.

A short time after this encounter with John Doe, after it had become completely dark outside, Margaret Zavalidroga and Tomas Zavalidroga as a passenger, were stopped by Town of Kirkland police officer, Gene Sinardo, as Margaret Zavalidroga was driving her car away from the church down Marvin St. Sinardo demanded to know if the Zavalidrogas had earlier been parked down the street in the direction of where John Doe had accosted Tomas Zavalidroga. Sinardo became increasingly belligerent in his behavior and at one point threatened Tomas Zavalidroga with arrest if he did not answer Sinardo's questions. Sinardo then asked for the Zavalidroga's identification and kept the Zavalidrogas detained for at least 15 or 20 minutes while he made the ID check. When Sinardo returned to the Zavalidrogas, he began searching around the outside of Margaret Zavalidroga's car and then stated that he noticed an expired inspection sticker o the Zavalidroga car. As a result of Sinardo's unlawful stop and detainment, the Zavalidrogas suffered great emotional distress and the loss of their fourth and fourteenth Amendment rights.

On Thursday, February 10th, 2011 at approximately 4pm, Tomas Zavalidroga drove Margaret Zavalidroga to the emergency room of the Faxton-St. Lukes Hospital in New Hartford, NY. after Margaret Zavalidroga complained of feeling unwell. Tomas Zavalidroga had suggested to the hospital staff that Margaret Zavalidroga's illness might have been related to the sub-zero weather the region had experienced the previous few days. The emergency room staff, which was being supervised by Dr. Kevin Catney, concurred and quickly began warming Margaret Zavalidroga.

Margaret Zavalidroga began responding well to the treatment but at approximately 7pm, the Zavalidrogas were informed that the hospital staff

wished to take a series of exploratory x-rays. Margaret Zavalidroga expressed her concern that it was against her personal policy to permit xrays except the most compelling reasons. Tomas Zavalidroga, as medical agent and proxy for Margaret Zavalidroga, also communicated this to the staff and Dr. Catney, but nonetheless, the medical staff took a series of xrays in spite of the Zavalidroga's wishes. Further, the hospital staff informed the Zavalidrogas that on the basis of Margaret Zavalidroga's alleged incorrect answers to a few questions they had asked her, such as the date, they had adjudged Margaret Zavalidroga as incompetent to make her own decisions. The staff had also refused to acknowledge Tomas Zavalidroga as Margaret Zavalidroga's medical agent and proxy. At about 8 p.m., the Zavalidrogas had overheard an announcement on the hospital's speaker system summoning Dr. Catney to answer a phone call. The Zavalidroga's perceived this call as being related to Margaret Zavalidroga's treatment.

By 9pm, Dr. Catney had informed the Zavalidrogas that Margaret Zavalidroga was fit and no longer in need of medical attention. However, instead of discharging her, Dr. Catney informed Margaret Zavalidroga that she was ordered to stay in the hospital overnight. When the Zavalidrogas protested, they were told again that Margaret Zavalidroga was not mentally competent to leave the hospital. Later Tomas Zavalidroga asked the nitetime attending physician, Dr. Siddiqua to question Margaret Zavalidroga again. In the presence of Tomas Zavalidroga the Doctor asked Margaret Zavalidroga a series of questions which she answered correctly. Still, the attending physician would not allow Margaret Zavalidroga to be discharged.

Upon further inquiry, the chief nurse of the unit, Don, informed Tomas Zavalidroga that the staff had been in contact with someone representing the Oneida County Sheriff's Department who had instructed the hospital staff to detain Margaret Zavalidroga overnight at the hospital. The Zavalidrogas attempted to leave the hospital anyway but were physically stopped from leaving the hospital by the hospital's security staff.

The next day, Friday, the hospital continued to hold Maragret Zavalidroga against her wishes and against the wishes of her family. Later in the day, the staff at the hospital told the Zavalidrogas that her discharge from the hospital was being delayed by the Oneida County Department of Social Services. Tomas Zavalidroga while still at the hospital, talked with an investigator claiming to represent the Department of Social Services, Norman X. ,who informed Tomas Zavalidroga that his mother would not be discharged from the hospital unless members of the Oneida County Department of Social Services could inspect Margaret Zavalidroga's residence.

Margaret Zavalidroga was eventually held for four days at Faxton-St.Lukes

hospital against her will and against the wishes of her family even though she was never in need of continued medical care, blatantly in violation of the Fourth Amendment.

The Plaintiffs Zavalidrogas allege that members of the Oneida County Sheriffs Department and Oneida County Department of Social Services, in collusion with members of the Faxton-St Lukes Hospital staff, orchestrated Margaret Zavalidroga's detainment at the hospital for no other reason than to harass the Zavalidrogas. This is especially apparent in light of the fact that the Zavalidroga's had, a few weeks before, filed papers with the U.S. Supreme Court seeking review of earlier civil rights litigation involving the Oneida County Sheriffs Department. Even after her discharge from the hospital, the purported Social Services investigator, Norman X, continued to harass the Zavalidrogas by unlawfully attempting to gain entrance to Margaret Zavalidroga's home.

St. Lukes-Faxton also engaged in criminal fraud and enrichment when it contrived a bill of over $15,000.00 for Margaret Zavalidroga's unlawful stay, even though the only meaningful treatment Margaret Zavalidroga required was being reheated by an electric heater at the hospital for several hours. This is also confirmed by the vastly different treatment Maragret Zavalidroga received from others who are treated for the same condition.

New York Municipal insurance reciprocal (NYMIR), an insurance company which insures municipalities, has been brought into this lawsuit as a result of its continuing attempt to rig State Court actions against Margaret Zavalidroga, seeking fraudulent judgments and liens against her.

NYMIR had indemnified a municipality which Margaret Zavalidroga sued in 2009 for civil rights abuses. In August of 2009, NYMIR paid Margaret Zavalidroga funds which Maragret Zavalidroga accepted towards settlement of her claim against the municipality. Shortly thereafter, the Federal district court removed the municipality from the lawsuit as a result of Margaret Zavalidroga's request. A few days after the municipality was removed from the lawsuit, NYMIR communicated to Margaret Zavalidroga that the payment of funds to her had been in error and that NYMIR sought the return of these funds.

Without any communication to the Federal Court, NYMIR, a short time later, brought suit against Zavalidroga for return of the settlement funds in New York State Supreme Court, Albany County, which is were NYMIR offices are located. Notably, apart from its attempt to circumvent Federal law, NYMIR corruptly brought suit in their home county (instead of the proper venue) which is where NYMIR, a company with billions in assets, could influence

State Court action. To make matters worse, NYMIR sought a judgment against Margaret Zavalidroga even though it never properly initiated legal action against her under New York State law or federal law in violation of Zavalidroga's federal 14th amendment due process rights.

The Zavalidrogas also allege that a clear pattern and motive has emerged since Jeffery Kelley's and Andrew Clark's attack whereby the Irish-Celtic Kelley and Clark appear to have been insulated from prosecution, under color of law, by Irish-Celtic State actors, to the detriment of the Eastern European Zavalidrogas. There is also strong evidence that the initial pre-St. Patrick's Day attack by Kelley and Clark and the inaction and misdeeds of the State actors involved were racially motivated. A preponderance of State actors involved were themselves Irish-Celtic.

Upon information and belief, the Zavalidrogas allege that Dr. Kevin Catney, Dohn Doe, Attorneys for NYMIR and the state Court judge NYMIR secured for its fraudulent litigation are also Irich-Celtic, and as a result, knew they had special access to local police and other state actors and could act with impunity.

(Paragraph numbering omitted.)  The amended complaint sets forth two causes of action.  The first, citing 42 U.S.C. § 1981 ("section 1981"), claims that defendants' actions under color of law have deprived plaintiffs of their constitutional rights to equal protection, due process, free speech, and the right to be free from unlawful seizure.  The second, citing 42 U.S.C. §§ 1983 ("section 1983") and 1985 ("section 1985"), claims that defendants, acting under color of law and "pursuant to the *de facto* policies and customs of the County of Oneida and the State of New York" have deprived plaintiffs of "certain other rights, privileges and immunities guaranteed to them under the Constitution of the United States[.]"

**DISCUSSION**

**Applicable Law**

I.        Motion to Dismiss

Defendants' motions to dismiss are primarily based on the argument that the amended

-9-

complaint (Dkt. No. 8) fails to state a cause of action.  See Fed. R. Civ. P. 12(b)(6).  To survive a dismissal motion, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See ATSI Commc'n, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Where the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that the plaintiff is entitled to relief.  *Ashcroft v. Iqbal*, 129 S. Ct. at 1950.  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Id*. at 1949.

A complaint should be "especially liberally construed when it is submitted *pro se* and alleges civil rights violations."  *See Jacobs v. Mostow*, 271 Fed.Appx. 85, 87 (2d Cir. 2008) (citing *Fernandez v. Chertoff*, 471 F.3d 45, 51 (2d Cir. 2006)).  The submissions of a *pro se* litigant should be interpreted to raise the strongest arguments that they suggest.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).  Courts should not dismiss without granting leave to amend at least once when a liberal reading of a *pro se* complaint gives any indication that a valid claim might be stated.  *See Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999).

II.      42 U.S.C. § 1981

Plaintiffs assert infringement of their rights under 42 U.S.C. § 1981 ("section 1981").

-10-

Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]

A section 1981 claim may be brought against private actors who intentionally discriminate on the basis of race or ethnicity. *See* 42 U.S.C. § 1981(c); *Wong v. Mangone*, 450 Fed.Appx. 27, 30 (2d Cir. 2011). As the Second Circuit has recently observed, a section 1981 violation "may occur when a private individual injures 'the security of persons and property' in violation of a state law, and does so with a racially discriminatory purpose." *Id.* (noting that New York State laws prohibiting assault and battery are clearly intended for the "security of persons" within the meaning of section 1981).

To state a section 1981 claim, a plaintiff must allege facts supporting the following elements: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec.*, 7 F.3d 1085, 1087 (2d Cir. 1993). Section 1981 prohibits discrimination on the basis of race, ancestry, or ethnic characteristics, but does not prohibit discrimination on the basis of national origin. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citing *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("[Section] 1981 at a minimum, reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of *homo sapiens*." (internal quotes omitted)).

-11-

III.    42 U.S.C. § 1983; Section 1983 Conspiracy

Plaintiffs also assert claims under 42 U.S.C. § 1983 ("section 1983").  To make out a

cause of action under section 1983, a plaintiff must show that the defendant, acting under color of

state law, deprived the plaintiff of "any rights, privileges, or immunities secured by the

Constitution and laws."

The amended complaint includes section 1983 conspiracy claims.  To state such a claim a

plaintiff must allege "(1) an agreement between [two or more state actors or] a state actor and a

private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in

furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307,

324–25 (2d Cir. 2002) (citation omitted).  Conclusory, vague, or general allegations that the

defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights will

not suffice.  *Id.* at 325.  Regarding a section 1983 conspiracy claim against a private entity, the

Second Circuit explains:

> To state a claim against a private entity on a section 1983 conspiracy theory
> the complaint must allege facts demonstrating that the private entity acted in
> concert with the state actor to commit an unconstitutional act. Put differently,
> a private actor acts under color of state law when the private actor is a willful
> participant in joint activity with the State or its agents.  A merely conclusory
> allegation that a private entity acted in concert with a state actor does not
> suffice to state a § 1983 claim against the private entity.

*Id.* at 324 (citations and internal quotes omitted).

IV.    42 U.S.C. § 1985

A claim for conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3) has four

elements: "(1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the

equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in

-12-

furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen." *Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir. 2007), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  Section 1985(3) contains no requirement of state action and thus extends to private conspiracies.  *See id.* at 101.

**Motion by Defendants Oneida County Sheriff's Department, Lee Broniszewski, Oneida County Department of Social Services, Richard Ferucci, County of Oneida, and Norman Peep (Dkt. No. 18)**

> I.   Defendant Lee Broniszewski

The allegations against Lee Broniszewski, a deputy sheriff, are as follows: that he was the first law enforcement officer to enter the dollar store in response to the 911 call; that he "immediately compelled [Tomas] Zavalidroga to drop the telephone he was speaking on and forced Zavalidroga back to a remote corner of the store"; and that, "without permission, [he] began to reach into Zavalidroga's pockets and remove items, thereby violating Zavalidroga's Fourth Amendment rights."  The Court reads the amended complaint as asserting claims against Deputy Broniszewski under sections 1981 and 1983.

Beginning with the section 1983 claim, the amended complaint plausibly asserts a Fourth Amendment violation against Deputy Broniszewski.  Deputy Broniszewski argues that the alleged conduct, even if it did occur, was proper under *Terry v. Ohio*, 392 U.S. 1 (1968).  The record is insufficient to enable the Court to evaluate the incident in light of *Terry*.  Dismissal of Tomas Zavalidroga's section 1983 claim against Deputy Broniszewski is denied.

The section 1981 claim appears to be based on Tomas Zavalidroga's allegation that he is

of Eastern European heritage.  While it is questionable whether Eastern Europeans constitute a distinct racial group, *see Anderson*, 156 F.3d at 170, the Court need not resolve the issue on this motion.  There is nothing in the record to indicate that Deputy Broniszewski's alleged misconduct was motivated by racial discrimination so as to support a section 1981 claim.  *See, e.g., Williams v. Calderoni*, 2012 WL 691832, *7 (S.D.N.Y. March 1, 2012) ("[T]he mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened <u>because</u> the person is a member of that racial group." (emphasis in original)).  Plaintiffs have had ample opportunity to allege specific facts in support of this claim in their lengthy and detailed complaint and amended complaint and in their papers opposing the instant motion, and they have failed to do so.  There is nothing to indicate that they could state a plausible section 1981 claim if given another opportunity.  This claim is dismissed without leave to replead.

The Court does not read the amended complaint as intended to assert a conspiracy claim against Deputy Broniszewski under sections 1983 and/or 1985.  In any event, the amended complaint contains no indication that a valid conspiracy claim could be stated involving this defendant.  To the extent that the amended complaint may be read to assert section 1983 and/or 1985 conspiracy claims against Deputy Broniszewski, such claims are dismissed without leave to replead.  Thus, all claims against Deputy Broniszewski except the non-conspiracy 1983 claim are dismissed without leave to replead.

## II.   Defendant Richard Ferucci

The allegations against Richard Ferucci, an investigator with the Oneida County District Attorney's Office, are as follows:

> A short time after having filed their criminal Complaints against Kelley and Clark with Oneida County District Attorney McNamara, Maragret

-14-

> Zavalidroga received a "courtesy call" from an investigator with the District Attorney's office, Richard Ferucci, who claimed to be calling on behalf of Oneida County Adult Protective Services. Ferucci stated that he had received an anonymous call from a member of the public who was concerned for Margaret Zavalidroga's welfare. Zavalidroga told Ferucci about the threatening conduct of Kelley. At one point in the telephone conversation, Ferucci stated that he was concerned that someone like Margaret Zavalidroga might, "end up dead the next week." Neither Ferucci nor anyone else with the District Attorney's office did anything about Kelley. It was obvious to the Zavalidrogas that Ferucci's contrived "courtesy call" of concern was little more than a veiled threat which further chilled the Zavalidroga's civil rights.

The amended complaint acknowledges that Ferucci assists Oneida County Department of Social Services with investigations.  Even accepting that he made the telephone call as alleged, the amended complaint fails to state a plausible section 1981 claim against him, nor is there any indication that a valid claim could be stated.  Likewise, with respect to section 1983, the amended complaint alleges no facts that would support a plausible claim that Ferucci deprived plaintiffs of a constitutional right, or that he conspired with anyone to do so.  Further, the amended complaint contains nothing more than vague, conclusory assertions regarding any section 1985 conspiracy.  All claims against Ferucci are dismissed without leave to replead.

III.   Defendant Norman Peep

As against defendant Norman Peep (sued as "Norman X"), the amended complaint claims that, after plaintiff Margaret Zavaladroga was hospitalized, the following occurred:

> Tomas Zavalidroga while still at the hospital, talked with an investigator claiming to represent the Department of Social Services, Norman X. ,who informed Tomas Zavalidroga that his mother would not be discharged from the hospital unless members of the Oneida County Department of Social Services could inspect Margaret Zavalidroga's residence.

> Margaret Zavalidroga was eventually held for four days at Faxton-St.Lukes hospital against her will and against the wishes of her family even though she was never in need of continued medical care, blatantly in violation of the Fourth Amendment.

-15-

The Plaintiffs Zavalidrogas allege that members of the Oneida County Sheriffs Department and Oneida County Department of Social Services, in collusion with members of the Faxton-St Lukes Hospital staff, orchestrated Margaret Zavalidroga's detainment at the hospital for no other reason than to harass the Zavalidrogas. This is especially apparent in light of the fact that the Zavalidroga's had, a few weeks before, filed papers with the U.S. Supreme Court seeking review of earlier civil rights litigation involving the Oneida County Sheriffs Department. Even after her discharge from the hospital, the purported Social Services investigator, Norman X, continued to harass the Zavalidrogas by unlawfully attempting to gain entrance to Margaret Zavalidroga's home.

The claim that Margaret Zavaladroga was hospitalized involuntarily while not in need of medical care implicates Fourth Amendment and due process guarantees. *See generally Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1061 (2d Cir. 1995); *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). Norman Peep's involvement, although not clear, is sufficiently alleged to withstand Rule 12(b)(6) dismissal of the section 1983 claim against him. Likewise, there is enough in the amended complaint, read most favorably to plaintiffs, to allow the section 1983 conspiracy claim against Peep to stand. It is true that the support for these claims is sparse; however, in view of the length and complexity of the amended complaint, the number of defendants and claims, and plaintiffs' *pro se* status, it is more just and efficient to allow the claims to go forward at this stage, rather than directing plaintiffs to amend or dismissing with leave to replead.

The section 1981 claim appears to be based on plaintiffs' allegation that they are of Eastern European heritage. Even if this constitutes a racial group for section 1981 purposes, there is nothing in the record to indicate that Norman Peep's conduct was motivated by racial discrimination so as to support a section 1981 claim. Likewise, there is nothing to indicate that Norman Peep's conduct was motivated by racial or otherwise class-based, invidiously discriminatory animus. Plaintiffs have had the opportunity to allege sufficient specific facts in

-16-

support of these claims in their lengthy and detailed amended complaint and papers opposing the instant motion, and have failed to do so. There is no indication in the record that they could state plausible section 1981 and/or section 1985 claims if given another opportunity. These claims are dismissed without leave to replead.

Accordingly, dismissal is denied regarding the section 1983 claims (both non-conspiracy and conspiracy) against Norman Peep and otherwise granted without leave to replead.

IV.   Defendants County of Oneida, Oneida County Sheriff's Department, and Oneida County Department of Social Services

Defendants County of Oneida ("County"), Oneida County Sheriff's Department, and Oneida County Department of Social Services move for dismissal. The Oneida County Sheriff's Department and Oneida County Department of Social Services are merely administrative arms of the County and lack a separate legal identity. Thus, they are not proper defendants, and the claims against them are dismissed solely on this ground. *See, e.g., Adesola v. County of Nassau Sheriff's Dep't.*, 2012 WL 928316, *3 (E.D.N.Y. Mar. 13, 2012); *Allen v. Nassau Co. Exec. Office*, 2011 WL 1061019, *7 (E.D.N.Y. Feb. 15, 2011). All claims against Oneida County Sheriff's Department and Oneida County Department of Social Services are construed to be claims against the County of Oneida.

The County argues that there is no basis in the record to impose liability on it for the actions of any of its employees. To hold a municipality liable for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978)); *accord Harper v. City of N.Y.*, 424 Fed.Appx. 36, 38 (2d Cir. 2011).

-17-

In opposition to the dismissal motion, plaintiffs state:

> It can fairly be ascertained from the facts presented that the defendants, Kelley and Clark in particular, were deliberately insulated from prosecution by other defendants.  In the case of Clark this was done on two separate occasions, first during the 2008 attack involving Kelley and Clark and later in 2010 when both Tomas and Margaret Zavaladroga allege they saw Clark fire a handgun shot out the window of his truck, and law enforcement was directed not to respond to the incident.

> The plaintiffs have long asserted the primary state actors orchestrating these events were Oneida County District Attorney McNamara and then-Sheriff Middaugh.  McNamara, Middaugh, Kelley and Clark (son of a Scottish minister) are all known to be of the Celtic race.
> ***
> The Zavalidrogas also allege that a clear pattern and motive has emerged since Jeffery Kelley's and Andrew Clark's attack whereby the Irish-Celtic Kelley and Clark appear to have been insulated from prosecution, under color of law, by Irish-Celtic State actors, to the detriment of the Eastern European Zavalidrogas. There is also strong evidence that the initial pre-St. Patrick's Day attack by Kelley and Clark and the inaction and misdeeds of the State actors involved were racially motivated. A preponderance of State actors involved were themselves Irish-Celtic.

These conclusory allegations do not enable the court to draw the reasonable inference that the County has an official policy or custom to persecute plaintiffs or insulate Kelley and Clark from prosecution.  There is nothing in the record to suggest that the County is in any way responsible for any discrimination against plaintiffs based on race or nationality, either by the named defendants or any other County actor.  Plaintiff's allegations are wholly inadequate to suggest that they may be able to state a section 1981 or 1985 claim against the County.  Despite the opportunity to allege facts in support of such claims in their amended complaint and papers opposing the instant motion, plaintiffs have presented nothing to indicate that they could state plausible claims if given another opportunity.  All section 1981 and 1985 claims against the County are dismissed, without leave to replead.

-18-

With respect to section 1983, interpreting plaintiffs' submissions to raise the strongest arguments that they suggest, the Court finds it possible that plaintiffs may be able to state a plausible section 1983 claim against the County for *Monell* liability for the conduct of Norman Peep in connection with the hospitalization of Margaret Zavaladroga.  The alleged events surrounding the hospitalization of Margaret Zavaladroga may also support an inference of municipal participation in a conspiracy under section 1983.   It is true that the support for these claims is sparse; however, in view of the length and complexity of the amended complaint, the number of defendants and claims, and plaintiffs' *pro se* status, it is more just and efficient to allow the claims to go forward at this stage, rather than directing plaintiffs to amend or dismissing with leave to replead.

There is no other ground for a section 1983 claim.  While the Court has not dismissed plaintiffs' non-conspiracy section 1983 claim against Deputy Broniszewski, there is nothing in the record to suggest that the County may be liable for Deputy Broniszewski's conduct based on *Monell*, conspiracy, or any other ground.  Other than the claims involving the hospitalization of Margaret Zavaladroga, there is nothing in the record to suggest that the County could be in any way responsible for any constitutional deprivation, either by the named defendants or any other County actor.  Despite the opportunity to allege facts in support of such claims in their amended complaint and papers opposing the instant motion, plaintiffs have presented nothing to indicate that they could state plausible claims if given another opportunity.  All section 1983 claims against the County, except the claims involving the hospitalization of Margaret Zavaladroga are dismissed without leave to replead.

Thus, the claims against the Oneida County Sheriff's Department and Oneida County

Department of Social Services are dismissed on the ground that they are not proper defendants, and all claims against them are construed to be claims against the County.  Dismissal is denied as to the section 1983 claims (non-conspiracy and conspiracy) against the County in connection with the hospitalization of Margaret Zavaladroga, and otherwise granted without leave to replead.

       V.       Summary (Dkt. No. 18)

To summarize, the motion to dismiss (Dkt. No. 18) is granted in part and denied in part as follows: as to Deputy Broniszewski, dismissal of the non-conspiracy 1983 claims is denied, and dismissal is otherwise granted without leave to replead; as to Richard Ferucci, dismissal is granted without leave to replead; as to Norman Peep, dismissal is denied regarding the section 1983 claims (non-conspiracy and conspiracy) and is otherwise granted without leave to replead; all claims against the Oneida County Sheriff's Department and Oneida County Department of Social Services are dismissed on the ground that they are not proper defendants, and all claims against them are construed to be claims against the County; and as to the County, dismissal is denied as to the section 1983 claims (non-conspiracy and conspiracy) in connection with the hospitalization of Margaret Zavaladroga, and otherwise granted without leave to replead.

**Motion by defendant Andrew Clark (Dkt. No. 24)**

Defendant Andrew Clark ("Clark") moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). According to the amended complaint, on March 12, 2008, while Tomas Zavalidroga was riding his bicycle in the Village of Camden, defendant Jeffrey Kelley pursued him in his pickup truck. Tomas Zavalidroga alleges:

> [A] second red colored pick-up had raced up from a side street blocking Zavalidroga in the middle of the intersection. The individual in the red colored pickup, later identified as Andrew Clark, was then heard yelling out his window, "go on, get him".  Kelley by then had raced up, blocking Zavalidroga

from the rear.
\*\*\*
Zavalidroga eventually ditched his bicycle and took cover inside a dollar store on Camden's main street. Kelley quickly raced up in pursuit and parked in front of the Dollar Store. Almost simultaneously, Andrew Clark had also pulled up in his truck alongside Kelley in front of the Dollar Store.

Inside the store, a number patrons had gathered near the front window of the store. Zavalidroga asked those present to call 911 dispatch. Several of the patrons did this and the Zavalidroga himself was handed a phone and told the police dispatcher that Kelley and Clark had been pursuing him with their trucks. One of the patrons described Clark as a local commissner of Police.
\*\*\*
Zavalidroga asked Gabriel to remove Kelley and Clark from the front of the store so he could safely exit.  Gabriel refused to do this stating that, "They have a right to be there"..... It was clear to Zavalidroga that Gabriel and the other police officers present were during all they could to suppress Zavalidroga's First and Fourteenth Amendment rights and insulate Kelley and Clark from criminal prosecution.
\*\*\*
On September 11, 2010 at about 8:30 p.m., a truck matching one owned by Andrew Clark, pulled up in front of Margaret Zavalidroga's property, and the individual driving lowered the window and fired a handgun out the window, then spinning his wheels in a hasty departure.
\*\*\*
The Zavalidrogas also allege that a clear pattern and motive has emerged since Jeffery Kelley's and Andrew Clark's attack whereby the Irish-Celtic Kelley and Clark appear to have been insulated from prosecution, under color of law, by Irish-Celtic State actors, to the detriment of the Eastern European Zavalidrogas. There is also strong evidence that the initial pre-St. Patrick's Day attack by Kelley and Clark and the inaction and misdeeds of the State actors involved were racially motivated. A preponderance of State actors involved were themselves Irish-Celtic.

Tomas Zavalidroga also alleges that he complained to various law-enforcement authorities about the incidents, but that no action was taken.

Defendant Clark argues that the amended complaint fails to state a section 1981 cause of action against him.  The Court agrees.  Even accepting for the purpose of this motion that Eastern European heritage constitutes a "race" under section 1981, there is nothing but sheer conjecture to

suggest that Clark's alleged conduct was motivated by Tomas Zavalidroga's race.  *See, e.g.,*

*Williams*, 2012 WL 691832 at *7 (S.D.N.Y. March 1, 2012).  Plaintiffs have had ample

opportunity to allege sufficient specific facts in support of this claim in their lengthy and detailed

complaint and amended complaint and in their papers opposing the instant motion, and have

failed to do so.  There is no indication in their opposition papers or anywhere in the record that

they could state a plausible section 1981 claim if given another opportunity.

   As for the section 1983 claim, the amended complaint and other papers are devoid of any

basis to infer that Clark subjected Tomas Zavalidroga to a constitutional deprivation.  Likewise,

the submissions lack any basis to find that Clark acted under color of state law.  Even accepting

that someone in the dollar store "described Clark as a local commissioner of Police," this is not

evidence that Clark was in fact a local commissioner of police.  Moreover, even if Clark was the

local commissioner of police at the time in question, nothing in the amended complaint suggests

that he was acting under color of state law in the course of the incidents alleged.  It is well

established that "under color of law means under pretense of law and that acts of officers in the

ambit of their personal pursuits are plainly excluded."  *Pitchell v. Callan*, 13 F.3d 545, 547-48 (2d

Cir. 1994) (citation and internal quotes omitted).  And there is no basis to infer that he engaged in

a section 1983 conspiracy with a state actor; Kelley is not alleged to be a state actor, and there is

no basis to infer that Clark conspired with anyone else.  Nor is there any indication in plaintiffs'

opposition papers or any other part of the record that plaintiffs could state a plausible 1983 claim

if given another opportunity.

   Regarding section 1985, even assuming that Clark and Kelley were involved in some

conspiracy on March 12, 2008, there is nothing but sheer speculation to suggest that any such

conspiracy was motivated by some racial or otherwise class-based, invidious discriminatory animus. *See Mian*, 7 F.3d at 1088. There is no indication that plaintiffs could state a plausible section 1985 claim against Clark if given another opportunity.

Clark's motion to dismiss (Dkt. No. 24) is granted and all claims against him are dismissed without leave to replead.

**Motion by the Town of Kirkland and Gene C. Sinardo (Dkt. No. 57)**

Defendants Town of Kirkland ("Town") and Gene C. Sinardo, a Town police officer, move to dismiss the amended complaint on the ground that it fails to state a claim. Officer Sinardo also contends that he was never properly served with process.

The affidavit of service on Officer Sinardo (Dkt. No. 54) shows that the amended complaint was served on him "by personally delivering said materials to Town of Kirkland Clerk, Tuttle, at the Kirkland Town Hall." There is no allegation of mailing. Federal law provides for service on an individual as follows:

> Serving an Individual Within a Judicial District of the United States. Unless federal law provides otherwise, an individual ... may be served in a judicial district of the United States by:
> > (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
> > (2) doing any of the following:
> > > (A) delivering a copy of the summons and of the complaint to the individual personally;
> > > (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> > > (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e). Under New York law, personal service upon a natural person may be made:

> 1. by delivering the summons within the state to the person to be served; or

-23-

2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business...; or

3. by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318 ...; or

4. where service under paragraphs one and two cannot be made with due diligence, by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business...; or

5. in such manner as the court, upon motion without notice, directs, if service is impracticable under paragraphs one, two and four of this section.

6. For purposes of this section, "actual place of business" shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business.

N.Y.C.P.L.R. 308.

Based on the affidavit of service, none of these methods was satisfied.  In their opposition, plaintiffs argue that Officer Sinardo was properly served by service on the Town Clerk, and add: "A copy of the summons and complaint has also now been sent to Sinardo at the Kirkland Police Station in Clark Mills."  Even accepting this unsworn allegation of mailing, it does not cure the defect in service.  The claim against Officer Sinardo is dismissed without prejudice for lack of personal jurisdiction.

On the merits of the claim, the allegations in the amended complaint relative to the Town of Kirkland and Officer Sinardo are as follows:

On October 30th, 2010, Margaret Zavalidroga and Tomas Zavalidroga were in the Village of Clinton, Town of Kirkland, so that Margaret Zavalidroga could attend church services at Clinton's St. Mary's Church on Marvin St. in the village.  While Tomas Zavalidroga waited in Margaret Zavalidroga's car nearby, he was harassed by a local resident who disliked having Margaret Zavalidroga's legally parked car in front of his house.  The individual at one

-24-

point asked Tomas Zavalidroga to identify himself and then, in a threatening manner, began following Zavalidroga along Marvin St. for some distance as Zavalidroga walked toward the church.   Zavalidroga last saw the man speaking on a cell phone and then later looking into the windows of Margaret Zavalidroga's car.   This individual, whose name is currently unknown, is represented as John Doe in this Complaint.

A short time after this encounter with John Doe, after it had become completely dark outside, Margaret Zavalidroga and Tomas Zavalidroga as a passenger, were stopped by Town of Kirkland police officer, Gene Sinardo, as Margaret Zavalidroga was driving her car away from the church down Marvin St.  Sinardo demanded to know if the Zavalidrogas had earlier been parked down the street in the direction of where John Doe had accosted Tomas Zavalidroga.  Sinardo became increasingly belligerent in his behavior and at one point threatened Tomas Zavalidroga with arrest if he did not answer Sinardo's questions.   Sinardo then asked for the Zavalidroga's identification and kept the Zavalidrogas detained for at least 15 or 20 minutes while he made the ID check.  When Sinardo returned to the Zavalidrogas, he began searching around the outside of Margaret Zavalidroga's car and then stated that he noticed an expired inspection sticker on the Zavalidroga car.  As a result of Sinardo's unlawful stop and detainment, the Zavalidrogas suffered great emotional distress and the loss of their fourth and fourteenth Amendment rights.

Two affidavits attached to the amended complaint set forth similar allegations.  The Town and Officer Sinardo argue that, even if the allegations are true, they do not state a plausible claim against them.

The amended complaint fails to state a section 1981 claim against either the Town or Officer Sinardo, because there is no allegation supporting a reasonable inference that Officer Sinardo's conduct bore any relation to plaintiffs' race.  Nor is there any indication in the opposition papers or any other part of the record that they could state a plausible 1981 claim if given another opportunity.  As for the traffic stop, viewed most favorably to plaintiffs, the amended complaint indicates that plaintiffs may be able to state a section 1983 claim against Officer Sinardo for infringement of plaintiffs' Fourth Amendment protection against

-25-

unreasonable search and seizure.  The amended complaint and other papers do not, however, contain the slightest indication that plaintiffs have a *Monell* claim against the Town, nor do they indicate that plaintiffs have a section 1983 or 1985 conspiracy claim against either the Town or Officer Sinardo.  There is nothing in the opposition papers or any other part of the record to suggest that plaintiffs could state such claims if given another opportunity.

Accordingly, as to Officer Sinardo, the motion to dismiss is granted without prejudice for the lack of proper service on him.  As to the Town, the motion for dismissal is granted without leave to replead.

**Motion by defendant New York Municipal Insurance Reciprocal ("NYMIR") (Dkt. No. 76)**

Plaintiffs' claim against defendant NYMIR is as follows:

> New York Municipal insurance reciprocal (NYMIR), an insurance company which insures municipalities, has been brought into this lawsuit as a result of its continuing attempt to rig State Court actions against Margaret Zavalidroga, seeking fraudulent judgments and liens against her.

> NYMIR had indemnified a municipality which Margaret Zavalidroga sued in 2009 for civil rights abuses. In August of 2009, NYMIR paid Margaret Zavalidroga funds which Maragret Zavalidroga accepted towards settlement of her claim against the municipality. Shortly thereafter, the Federal district court removed the municipality from the lawsuit as a result of Margaret Zavalidroga's request. A few days after the municipality was removed from the lawsuit, NYMIR communicated to Margaret Zavalidroga that the payment of funds to her had been in error and that NYMIR sought the return of these funds.

> Without any communication to the Federal Court, NYMIR, a short time later, brought suit against Zavalidroga for return of the settlement funds in New York State Supreme Court, Albany County, which is were NYMIR offices are located. Notably, apart from its attempt to circumvent Federal law, NYMIR corruptly brought suit in their home county (instead of the proper venue) which is where NYMIR, a company with billions in assets, could influence State Court action. To make matters worse, NYMIR sought a judgment against Margaret Zavalidroga even though it never properly initiated legal action against her under New York State law or federal law in violation of

-26-

Zavalidroga's federal 14th amendment due process rights.

It appears that plaintiffs did not properly serve NYMIR with process.  Rather than inquiring into the status of Erin Cashin, to whom the amended complaint was delivered, and the other issues concerning service of process on NYMIR, the Court determines that, in any event, the amended complaint fails to state a claim against NYMIR.  The Court reviews the amended complaint herein (the first pleading to include this claim), supplemented by the papers from the state-court record in *New York Mun. Ins. Reciprocal v. Margaret Zavalidroga*, New York State Supreme Court, County of Albany, Lynch, J.S.C., Index No. 8954-09 ("state-court action").  In that action, Hon. Michael C. Lynch, J.S.C. found that NYMIR had made a $9,697.86 payment to Margaret Zavalidroga in error and was entitled to recover that amount from her.  On January 13, 2011, Judge Lynch issued a decision awarding summary judgment to NYMIR against Margaret Zavalidroga for $9,697.86 plus costs.  NYMIR sent Margaret Zavaladroga a notice of settlement of judgment dated February 28, 2011, and the judgment was entered on June 15, 2011.

The papers before this Court from the state-court action include the Memorandum of Law submitted to the state court by Margaret Zavalidroga, attached as Exhibit B to plaintiff's amended complaint herein, and the motion papers, summary judgment decision, and judgment from the state-court action, submitted by NYMIR in support of the instant dismissal motion.  In her papers in opposition to NYMIR's dismissal motion, Margaret Zavalidroga does not object to this Court's consideration of the record in the state-court action; to the contrary, her discussion of the state-court action establishes that the state-court record is integral to her present claim against NYMIR.  Accordingly, in addressing the instant motion, the Court considers the state-court papers, on the grounds that they are matters of public record, that they are integral to Margaret Zavalidroga's

claim, and that she has had notice and an opportunity to address them.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991).

On review of the amended complaint, plaintiffs' other submissions, and the papers in the state-court action, the Court finds absolutely no support for a claim of racial discrimination; thus, there is no basis for a section 1981 claim.  In their section 1983 claim, plaintiffs do not claim that NYMIR is a state actor; rather, they allege a conspiracy between NYMIR and state actors, particularly Judge Lynch.  The record is devoid of any indication of a conspiracy, nor is there any other evidence that plaintiffs might have a valid section 1983 claim against NYMIR.  For the same reasons, there is no support for their section 1985 claim alleging a conspiracy motivated by racial, ethnic, or other class-based discrimination.

Viewing the record most favorably to plaintiffs, and interpreting it to raise the strongest arguments their allegations suggest, the Court finds no indication that a valid claim could be stated.  Therefore, NYMIR's motion (Dkt. No. 76) is granted and the claim dismissed without leave to replead.

**Motion by Village of Camden and Charles Gabriel (Dkt. No. 78)**

Defendants Village of Camden ("Village") and Charles Gabriel, a Village police officer, move (Dkt. No. 78) to dismiss the amended complaint on the ground that it fails to state a claim. Officer Gabriel also contends that he was never properly served with process.

In the affidavit of service (Dkt. No. 7), the process server states that he "personally served" the pleadings "upon the following individuals: ... Charles Gabriel (care of Mayor Wolzmuth), Tamarack Terrace, Camden, N.Y."  As discussed above in connection with service on Officer Sinardo, Rule 4 of the Federal Rules of Civil Procedure and Rule 308 of New York

Civil Practice Law and Rules set forth the methods of service on an individual.  Based on the affidavit of service, none of these methods was satisfied.  Plaintiffs' response to the motion is simply that Officer Gabriel was "properly served by multiple means."  Plaintiffs have failed to obtain personal jurisdiction over Officer Gabriel.

The allegations in the amended complaint against Officer Gabriel concern events occurring in the dollar store on March 12, 2008 in response to the 911 call.  The amended complaint states:

> A short time later Broniszewski was joined by several other police officers from various agencies. One of these officers, Village of Camden patrolman, Charles Gabriel, quickly took the lead. Zavalidroga asked Gabriel to remove Kelley and Clark from the front of the store so he could safely exit.  Gabriel refused to do this stating that, "They have a right to be there".  Instead of entertaining arrests of Kelley and Clark, Gabriel began to accost Zavalidroga. Gabriel demanded to know why Zavalidroga had been distributing the leaflets throughout the Village. Gabriel also stated that the content of the leaflets looked like slander of the Kelley family to him. It was clear to Zavalidroga that Gabriel and the other police officers present were during all they could to suppress Zavalidroga's First and Fourteenth Amendment rights and insulate Kelley and Clark from criminal prosecution.

The Village and Officer Gabriel argue that, even if the allegations are true, they do not state a plausible claim against them.  In their opposition to the motion, plaintiffs allege for the first time that the Village had a policy and practice of allowing its police and certain private citizens "to run amok with impunity" and that Officer Gabriel was "ill-trained" and "knew that his only role was to defend organized crime activities" at the behest of the Village.  These unsworn, unsupported, and conclusory allegations do not assist plaintiffs in stating plausible claims against the Village or Officer Gabriel.

The amended complaint and other submissions fail to state a section 1981 claim against either the Village or Officer Gabriel, because there is no allegation supporting a reasonable

-29-

inference that Officer Gabriel's conduct bore any relation to Tomas Zavalidroga's race.

Likewise, there is no basis to infer that Officer Gabriel deprived the plaintiff of "any rights,

privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.   There is no

indication that plaintiffs have a *Monell* claim against the Village, or that plaintiffs have a section

1985 or 1985 conspiracy claim against the Village and/or Officer Gabriel.  Even on the most

liberal reading of the amended complaint, supplemented by plaintiffs' other submissions

(including their opposition to the motion), there is no indication that a valid claim might be stated.

Nor is there any indication in their opposition papers or any other part of the record that they

could state a plausible claim if given another opportunity.

Accordingly, as to Officer Gabriel, the motion to dismiss is granted on the grounds of lack

of personal jurisdiction and failure to state a claim, and leave to replead is denied.  As to the

Village, the motion to dismiss is granted for failure to state a claim without leave to replead.

## CONCLUSION

It is therefore

ORDERED that the letter motion (Dkt. No. 62) by defendant Norman Peep, requesting

that all references to Norman X in the motion to dismiss (Dkt. No. 18) be deemed to refer to

Norman Peep, is granted; and it is further

ORDERED that the motion to dismiss (Dkt. No. 18) by Oneida County Sheriff's

Department, Lee Broniszewski, Oneida County Department of Social Services, Richard Ferucci,

County of Oneida, and Norman Peep is granted in part and denied in part as follows: as to Lee

Broniszewski, dismissal is denied as to the non-conspiracy claim under 42 U.S.C. § 1983, and

otherwise granted without leave to replead; as to Richard Ferucci, dismissal is granted without

leave to replead; as to Norman Peep, dismissal is denied as to the claims under 42 U.S.C. § 1983 (non-conspiracy and conspiracy), and otherwise granted without leave to replead; as to the Oneida County Sheriff's Department and Oneida County Department of Social Services, they are dismissed from the case and all claims against them are construed to be claims against the County of Oneida; and as to the County of Oneida, dismissal is denied as to the claims under 42 U.S.C. § 1983 (non-conspiracy and conspiracy) in connection with the hospitalization of Margaret Zavaladroga, and otherwise granted without leave to replead; and it is further

ORDERED that the motion to dismiss by Andrew Clark (Dkt. No. 24) is granted and all claims against him are dismissed without leave to replead; and it is further

ORDERED that the motion to dismiss by the Town of Kirkland and Gene C. Sinardo (Dkt. No. 57) is granted without prejudice as to Officer Sinardo for lack of personal jurisdiction; and all claims are dismissed without leave to replead as against the Town of Kirkland; and it is further

ORDERED that the motion to dismiss by New York Municipal Insurance Reciprocal (Dkt. No. 76) is granted without leave to replead; and it is further

ORDERED that the motion to dismiss by the Village of Camden and Charles Gabriel (Dkt. No. 78) is granted without leave to replead; and it is further

ORDERED that the case shall proceed on the first amended complaint (Dkt. No. 8) on the following claims: the claims under 42 U.S.C. § 1983 (non-conspiracy only) against Lee Broniszewski; the claims under 42 U.S.C. § 1983 (both non-conspiracy and conspiracy) against Norman Peep (Norman X); the claims under 42 U.S.C. § 1983 (both non-conspiracy and conspiracy) against Oneida County in connection with the hospitalization of Margaret

Zavaladroga; the claims against Jeffrey Kelley; the claims against Faxton-St. Lukes Hospital; and the claims against Dr. Kevin Catney; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

Date:   March 29, 2012
        Syracuse, New York

Honorable Norman A. Mordue
U.S. District Judge

-32-